IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION

EDWARD LEE ROBERTSON,

        Petitioner,

                                      No. 1:15-cv-01229-JDB-egb

v.

UNITED STATES OF AMERICA,

        Respondent.

---

ORDER DIRECTING CLERK TO TERMINATE MOTIONS,
DENYING § 2255 MOTION,
DENYING CERTIFICATE OF APPEALABILITY,
AND
DENYING LEAVE TO APPEAL *IN FORMA PAUPERIS*

---

Petitioner, Edward Lee Robertson,[1] a federal prisoner, has filed an amended motion (the

"Amended Petition") pursuant to 28 U.S.C. § 2255 to vacate, set aside, or correct his sentence.

(Docket Entry ("D.E.") 16-1.[2])  For the reasons that follow, the Amended Petition is DENIED.

## BACKGROUND

In May 2014, a federal grand jury returned a one-count indictment charging Robertson

with unlawful possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g).

---

[1] In its discussion of the underlying criminal matter, the Court will refer to Robertson as
"the Defendant."

[2] Unless otherwise noted, record citations in this order are to documents filed in Case
No. ("No.") 1:15-cv-01229-JDB-egb.

(No. 1:14-cr-10053-JDB-1, D.E. 1.)  The Federal Defender's Office was appointed to represent him, (*id.*, D.E. 7), and Randolph Alden was assigned as his attorney, (*id.*, D.E. 9).

According to the Presentence Report ("PSR"), the charges against the Defendant arose from a March 7, 2014, probation search of his residence in Bolivar, Tennessee.  Two handguns were found—one inside a lamp in the living room and one on the side of a bed where Robertson's watch was located.  In addition to the firearms, officers discovered a pill bottle containing five hydrocodone pills with a label partially torn off, as well as a small quantity of marijuana.  "Approximately $7000 in cash was found in an undisclosed location and [over $9000] was found hidden in a lamp."  (PSR at 4.)  Among the cash "was a marked bill that had been given to Robertson in exchange for narcotics during a recent undercover purchase conducted by the Bolivar Police."  (*Id.*)

In October 2014, Defendant entered into a written plea agreement with the Government.  (No. 1:14-cr-10053-JDB-1, D.E. 25.)  He agreed to plead guilty to the indictment and waive his right to appeal, with certain exceptions.  The parties would jointly recommend a sentence within the United States Sentencing Guidelines ("Guidelines" or "U.S.S.G.") range, and the Government promised not to object to a decrease in the offense level based upon his acceptance of responsibility, with certain conditions.[3]  Under the terms of the agreement, Robertson could withdraw his guilty plea if he was determined to be an armed career criminal under the Armed Career Criminal Act, 18 U.S.C. § 924(e).

The Defendant subsequently pleaded guilty at a hearing before the Court.  After the required colloquy, *see* Fed. R. Crim. P. 11(b), the Court accepted the plea.  (No. 1:14-cr-10053-JDB-1, D.E. 24.)

---

[3] All references to the Guidelines are to those in effect on the date of Robertson's sentencing.  *See* United States Sentencing Commission, *Guidelines Manual* (eff. Nov. 1, 2014).

The United States Probation Office ("USPO") calculated the Defendant's advisory Guideline range in anticipation of sentencing. (PSR at 20.) The Defendant was assigned a base offense level of 24 under U.S.S.G. § 2K2.1(a)(2), based on prior drug convictions. (*Id.* at 4-5, 8, 12.) The offense level was increased four levels under § 2K2.1(b)(6)(B). That section advises an increase in offense level "[i]f the defendant . . . used or possessed any firearm or ammunition in connection with another felony offense; or possessed or transferred any firearm or ammunition with knowledge, intent, or reason to believe that it would be used or possessed in connection with another felony offense." U.S.S.G § 2K2.1(b)(6)(B). In applying that provision, the USPO cited the Defendant's "possession of hydrocodone pills which investigators believed were for resale and proceeds from previous narcotics transactions." (PSR at 5.)

Points for acceptance of responsibility lowered the offense level by three. "Based upon a total offense level of 25 and a criminal history category of VI, the guideline imprisonment range [was] 110 months to 137 months." (*Id.* at 20 (emphasis omitted).) However, because the statutory maximum was ten years, "the restricted guideline range [was] 110 months to 120 months." (*Id.* (emphasis omitted) (citing U.S.S.G. § 5G1.1(c)(1)).)

On January 15, 2015, defense counsel filed a position paper reflecting that the Defendant had no objections to the PSR. (No. 1:14-cr-10053-JDB-1, D.E. 27.) On January 30, 2015, however, he filed a supplemental position paper challenging the PSR's application of § 2K2.1(b)(6)(B). (*Id.*, D.E. 31.) In a second addendum to the PSR, the USPO addressed counsel's argument and set forth why he believed the increase was warranted. (PSR 2d Addendum at 2.)

At the sentencing hearing, the Government presented a detective from the Bolivar Police Department who testified in support of the application of § 2K2.1(b)(6)(B). After considering

the testimony and the parties' arguments, the Court held that the enhancement applied. (No. 1:14-cr-10053-JDB-1, D.E. 38 at PageID 103.) The Court imposed a sentence of 110 months, along with three years of supervised release. (*Id.*, D.E. 32.)

On September 11, 2015, the inmate filed a motion under § 2255 (the "Petition"). (D.E. 1.) The Government responded to the Petition, which included an affidavit from attorney Alden. (D.E. 13.) Petitioner filed a reply (D.E. 18), and later an Amended Petition (D.E. 16-1) and a supporting affidavit (D.E. 16-2). The Amended Petition presented the following claims:

> Claim 1: Counsel provided ineffective assistance by "fail[ing] to file a notice of appeal" after "petitioner directed [him] twice" to do so.

> Claim 2: Counsel provided ineffective assistance by "fail[ing] to sufficiently object to and challenge the 2K2.1(b)(6)(B) enhancement causing prejudice to petitioner."

(D.E. 16-1 at PageID 100, 101.) [4]

Respondent submitted a response to the Amended Petition, (D.E. 23), and on May 2, 2018, the Court appointed counsel for Petitioner in anticipation of an evidentiary hearing (D.E. 35.) Appointed counsel filed a document styled "Petitioner's Amended Motion to Vacate, Set Aside or Correct Sentence Under 28 U.S.C. § 2255," which contained arguments in support of Claim 1. (D.E. 43.) The Government subsequently filed a revised affidavit from attorney Alden. (D.E. D.E. 45-1.) An evidentiary hearing was held on August 10, 2018, (D.E. 46), and the parties filed post-hearing briefs (D.E. 49; D.E. 50.) [5]

---

[4] Soon after the Petition was filed, the Clerk's office entered a text entry indicating that Robertson had requested relief pursuant to *Johnson v. United States*, 135 S. Ct. 2551 (2015). The memorandum accompanying the Petition, however, referenced a different *Johnson* case. (D.E. 1-1 at PageID 23-24 (citing *Johnson v. United States*, 430 F.3d 383 (6th Cir. 2005).) Nevertheless, the Court erred on the side of caution and considered whether Petitioner had a viable claim under the Supreme Court's *Johnson* decision. By order dated October 17, 2016, the Court held that such a claim was without merit. (D.E. 10.)

[5] The Clerk is DIRECTED to terminate the motions at D.E. 43 and D.E. 49.

**DISCUSSION**

The Court has reviewed the record in Robertson's criminal case, as well as the affidavits submitted in the instant case and the testimony taken at the hearing. On the record adduced, the Court determines that Petitioner has not established that his attorney rendered ineffective assistance.

## I.      Legal Standards

A prisoner seeking to vacate his sentence under § 2255 "must allege either (1) an error of constitutional magnitude; (2) a sentence imposed outside the statutory limits; or (3) an error of fact or law that was so fundamental as to render the entire proceeding invalid." *Short v. United States*, 471 F.3d 686, 691 (6th Cir. 2006) (quoting *Mallett v. United States*, 334 F.3d 491, 496-97 (6th Cir. 2003) (internal quotation marks omitted). A § 2255 claim that an attorney's ineffective assistance has deprived a criminal defendant of his Sixth Amendment right to counsel is controlled by the standards stated in *Strickland v. Washington*, 466 U.S. 668 (1984). *Grant v. United States*, 72 F.3d 503, 506 (6th Cir. 1996). To succeed on such a claim, a petitioner must demonstrate two elements: (1) "that counsel's performance was deficient"; and (2) "that the deficient performance prejudiced the defense." *Strickland*, 466 U.S. at 687. "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* at 686.

To establish deficient performance, a petitioner "must show that counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. A court considering a claim of ineffective assistance must apply "a strong presumption" that counsel's representation was "within the wide range of reasonable professional assistance; that is, the defendant must

overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* at 689 (internal quotation marks and citation omitted).

Prejudice is established where there exists "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* "It is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.'" *Harrington v. Richter*, 562 U.S. 86, 104 (2011) (quoting *Strickland*, 466 U.S. at 693). Instead, "[c]ounsel's errors must be 'so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'" *Id.* (quoting *Strickland*, 466 U.S. at 687).

## II.     Claim 1

In Claim 1, Petitioner asserts that his attorney rendered ineffective assistance by failing to file a notice of appeal after he directed him to do so, in violation of the precepts announced in *Roe v. Flores-Ortega*, 528 U.S. 470 (2000). (D.E. 16-1 at PageID 100 ("Petitioner directed counsel twice to file a notice of appeal and counsel failed to do so."); D.E. 49 at PageID 286 ("Petitioner specifically requested that Mr. Alden file the notice of appeal in his behalf.").)

In *Flores-Ortega*, the United States Supreme Court held that *Strickland*'s "test applies to claims . . . that counsel was constitutionally ineffective for failing to file a notice of appeal." *Flores-Ortega*, 528 U.S. at 477. An attorney who fails to file a timely notice of appeal after a request by his client performs deficiently. *Id.* Moreover, prejudice is presumed and the defendant need not show that "'his appeal would likely have had merit.'" *Id.* (quoting *Peguero v. United States*, 526 U.S. 23, 28 (1999)).

The Court in *Flores-Ortega* also extended *Strickland* to cases where "the defendant [did] not clearly convey[] his wishes one way or the other as to whether he wanted to file an appeal." *Id.* at 477. In such a circumstance, counsel renders ineffective assistance where he had a duty to consult with the defendant about an appeal but did not do so, and the failure prejudiced the defendant. *Id.* at 480, 484. "[C]onsult" means "advising the defendant about the advantages and disadvantages of taking an appeal, and making a reasonable effort to discover the defendant's wishes." *Id.* at 478.

Following *Flores-Ortega*, the Sixth Circuit held that "even when a defendant waives all or most of his right to appeal, an attorney who fails to file an appeal that a criminal defendant explicitly requests has, as a matter of law, provided ineffective assistance of counsel that entitles the defendant to relief in the form of a delayed appeal." *Campbell v. United States*, 686 F.3d 353, 360 (6th Cir. 2012).

At the start of the evidentiary hearing, Petitioner's appointed counsel confirmed that the only issue to be resolved was "whether Mr. Robertson directed Mr. Alden to file a notice of appeal." (D.E. 48 at PageID 225.) Those two individuals were called to testify.

Alden related that he had served as an assistant Federal Defender for fifteen years, and that previously, he was engaged in private practice where he defended federal defendants by appointment through "the Criminal Justice Act panel." (*Id.* at PageID 227, 245-46.) He recalled having represented Petitioner during his criminal case.

Counsel met with the Defendant early in the case to review the discovery materials and to discuss options. (*Id.* at PageID 228-29, 231.) At that time, the Defendant also faced state charges for drug trafficking. Counsel testified that the prosecutor in the federal case told him that "he was going to supersede on Mr. Robertson and add drug charges for those underlying

state" offenses. (*Id.* at PageID 252.) The parties negotiated a plea agreement, by which Robertson would plead guilty to Count 1 of the indictment and waive his appeal rights. The parties agreed to recommend a sentence within the Guidelines range. By admitting guilt, the Defendant avoided the superseding indictment, and thus a potential sentence of 188 to 235 months' imprisonment as a career offender. (*Id.* at 252-53.) Counsel related that he had "probably three or four" "conversations with Mr. Robertson regarding the circumstances around his plea agreement." (*Id.* at 247-48.)

Alden also stated that "[i]nitially" he did not challenge the imposition of the four-level enhancement, but when "directed by Mr. Robertson to do that, . . . [he] did." (*Id.* at PageID 234.) "[A]s his representative, I did what he asked me to do." (*Id.* at PageID 234-35.)

According to counsel, he met with his client "immediately after[]" sentencing "in the lockup . . . down the hall" from the courtroom. (*Id.* at PageID 239.) The Defendant, who "was unhappy about the one hundred and ten month sentence," asked counsel "'[I]s there any way that I can appeal the four-level enhancement?'"—or "words to th[at] effect." (*Id.*) Counsel did not regard that question as a direct request to appeal the enhancement, but as a solicitation for advice. (*Id.* at PageID 241, 243.) The public defender therefore discussed with his client "the merits of any appeal," the "effect of the appeal waiver[,] and the benefits that he was getting by pleading guilty and waiving the appeal." (*Id.* at 251.) Upon questioning by the Court, Alden elaborated:

> A. [W]hat I explained to him was that if we did file an appeal and he was successful, . . . it would be considered a breach of the plea agreement, and therefore, the government would be free to return to the state we were in prior to the plea.
>
> Q. That being?

A.   That being that . . . he could then be super[s]eded, they could bring all the other charges that the government had agreed not to charge him with.

Q.   Did you explain that to him--

A.   I did, your Honor.

Q.   --in that conversation?

A.   Well, again after sentencing, but also explained to him multiple times prior to the plea agreement.

Q.   All right.

A.   --that's the reason he entered into the plea agreement.

* * *

Q.   . . . [D]id he direct you, following your explanation of what upside downside of filing that appeal, did he, following that conversation, direct you at that point to file an appeal?

A.   . . . No, he never did.

Q.   And I'm talking about just in that conversation?

 A.   In that particular conversation he never directed me to file an appeal.  He didn't say anything to me to the effect of I don't care, that's great, that's fine, thank you for your advice, but I want you to do it anyway.  There was never any, in fact, I walked away from that understanding that he understood why he didn't want to appeal and that he was okay with that.

(*Id.* at PageID  254, 256.)

Alden further testified that, after their post-sentencing conversation, he received a letter from Petitioner again asking "Is there any way that I can appeal the 4 point enhancement?" (*Id.*at PageID 240-41; *see also* D.E. 13 at PageID 85.)  Counsel responded by letter, stating that "[t]he short answer to that is no," and then elaborating on the benefits of the plea deal, and the efforts made to challenge the enhancement at sentencing.  (D.E. 13 at PageID 88.)  He closed his letter with the statement "I hope this has answered all of your questions.  If not, please contact

me." (*Id.* at PageID 89.) Counsel testified that he regarded Petitioner's letter as a solicitation for advice—"a follow-up to our oral conversation that took place in the lockup." (D.E. 49 at PageID 241.)

Alden also stated that he did not hear back from his client, either by phone or written correspondence (*id.* at PageID 257), and was never, at any time, directed to file a notice of appeal (*id.* at PageID 247). He stated that "[i]t was our office policy and it is my policy, if someone directed me to file a notice of appeal, I did it irrespective of . . . an appeal waiver." (*Id.* at PageID 246-47.)

Petitioner recounted that he was surprised by the application of the four-level enhancement at sentencing. He insisted that he "was told [he] was going to be sentenced to 77 months" in prison and that he did not know about the enhancement before the sentencing hearing. (*Id.* at PageID 270-72.) He therefore wanted to appeal the enhancement. (*Id.* at PageID 270.) Robertson also recalled that, immediately after sentencing, he told counsel "I want to appeal this case" because the sentence was "nothing like you had told me, I said I want to appeal it." (D.E. 48 at PageID 269.) According to Petitioner, counsel told him that he would "come down to [the facility at] Obion [County] [to] talk to [him], which he never did." (*Id.* at PageID 269; *see also id.* at PageID 277.) Defendant then "wrote the letter" asking counsel whether there was any way to appeal the enhancement. (*Id.* at PageID 269.)

When pressed on cross-examination, Robertson admitted that he had reviewed a copy of the PSR with his attorney prior to sentencing, that the PSR discussed the enhancement, and that he had directed his attorney prior to sentencing to challenge the enhancement. (*Id.* at PageID 271-73.) Petitioner confirmed that he did not follow-up with counsel after receiving his letter,

and took no further action regarding an appeal. (*Id.* at PageID 276.) He claimed that he specifically told Alden that he wanted to appeal the enhancement. (*Id.*)

The Court credits Alden's testimony regarding the content of his discussions with the inmate, and finds that Petitioner's testimony is not credible. Although Robertson at first related that he wanted to appeal his sentence because he was surprised by the enhancement, on cross-examination he conceded that he had known about the potential enhancement prior to sentencing and had, in fact, directed counsel to challenge its application. And although he claims that counsel promised to visit him at the Obion County facility to discuss an appeal, he does not explain why that would be necessary if he had already directed him to file an appeal. In addition, he has not described why his post-sentencing letter did not ask counsel why he had not come to visit him or why a notice of appeal had not been filed. The Court therefore finds that Robertson never directed his attorney to file a notice of appeal, and that, had he done so, counsel would have undertaken that simple task.

Perhaps recognizing his predicament, Petitioner argues in the alternative that his inquiry about appealing the enhancement, and his use of the "word 'appeal' . . . multiple times" in his letter to counsel, so evidenced his desire to appeal that they are tantamount to directions to file an appeal. (D.E. 49 at PageID 285, 287.) The argument is without merit. Even assuming that Robertson communicated a desire to appeal, the Sixth Circuit has rejected the notion that something less than a specific instruction to appeal constitutes a direction to appeal for purposes of *Flores-Ortega*. *See Regalado v. United States*, 334 F.3d 520, 525-26 & n.3 (6th Cir. 2003) (holding that a defendant's expression of a "desire" or "wish" to appeal is not the equivalent of a specific instruction to file an appeal); *see also United States v. Gant*, No. CR 03-20369-1-JPM, 2011 WL 5239701, at *2 (W.D. Tenn. Nov. 1, 2011) (holding that petitioner's statement to

counsel "that he wanted to appeal his sentence if he was sentenced to consecutive terms of incarceration" was not a direction to file a notice of appeal) (internal quotation marks omitted) (relying on *Regalado*, 334 F.3d at 525-26 & n.3).

The Court further finds that Petitioner's inquiry was, as counsel reasonably understood it to be, a solicitation for advice, and that Alden responded by consulting with him about an appeal. As he had done in advising Petitioner about the plea agreement, Alden again described for his client the benefits of the agreement as weighed against the appeal waiver. He also explained that, if Petitioner did appeal and prevail, he risked additional charges and a lengthier sentence. Given their communications both before and after sentencing, counsel was satisfied that his client did not want to appeal. The Court concludes that Alden thus made "a reasonable effort to discover his client's wishes." *Flores-Ortega*, 528 U.S. at 478. Indeed, Petitioner has not argued that counsel did not consult with him about an appeal or that his advice was erroneous.

Accordingly, the Court finds that Petitioner has not established that counsel was ineffective regarding an appeal. Claim 1 is therefore DENIED.

## III.    Claim 2

Petitioner claims that counsel provided ineffective assistance by "fail[ing] to sufficiently object to and challenge the 2K2.1(b)(6)(B) enhancement causing prejudice to [him]." (D.E. 16-1 at PageID 101.) He argues that Alden "failed to present to the court a verifyable source of income for the funds found in [his] home," "failed to object to the PS[R] statement that there w[ere] marked bills found in [his] home," and "failed to object to the government not identifying what criminal statute petitioner[] violated." (*Id.*)

In support, Robertson avers in his affidavit that he "expressed multiple times to Mr. Alden that [he] had a legal source for the funds that were found in [his] home," specifically, an "insurance settlement and funds . . . from [his] wife['s] beauty salon which was [run] at [his] home." (D.E. 16-2 at PageID 110.) He further claims that "Mr. Alden never bothered to review the source or introduce to the court" that information. (*Id.*) Petitioner has submitted copies of documents from his insurance company purporting to show that the money found in his home was from an insurance pay-out. (D.E. 16-3.) He also alleges that he "told Mr. Alden that the government should be required to produce evidence of a marked bill from the alleged drug transaction," "but counsel did not do so." (D.E. 16-2 at PageID 111.)

In his revised affidavit, Alden states that

> . . . Mr. Roberston never indicated to me that there was a verifiable source of income for the funds discovered in the home. In fact, in meetings with me and also with my Investigator, Mr. Robertson asserted that he claimed the $7000 in the drawer but he stated "I don't know about the other money," referring to the money found hidden in the lamp. At no time did Mr. Robertson ever offer to me nor my investigator any records that established that the money found in the lamp was legitimate funds in any way.

(D.E. 45-1 at PageID 213.)

Defense counsel also notes in his revised affidavit that there was no need for him to have "lodged an objection to the United States 'not identifying what criminal statute petitioners (sic) conduct violated,'" since it was "'self-evident' that there is a federal or state law criminalizing such conduct." (*Id.* at PageID 214 (alteration in original) (citing *United States v. Grayer*, 625 F. App'x 313, 315 (6th Cir. 2015).)

For the following reasons, the Court concludes that Petitioner has not met his burden to show that counsel performed deficiently with regard to the enhancement, or that he was prejudiced by counsel's conduct.

**A. Counsel's Efforts in Challenging the Application of the Enhancement**

As noted, § 2K2.1(b)(6)(B) advises an increase in the offense level "[i]f the defendant . . . used or possessed any firearm or ammunition in connection with another felony offense; or possessed or transferred any firearm or ammunition with knowledge, intent, or reason to believe that it would be used or possessed in connection with another felony offense." U.S.S.G § 2K2.1(b)(6)(B). "[T]he relevant inquiry [under the second clause] is whether, at the time that the defendant possessed or transferred the firearm, he knew or had reason to know that the firearm had the potential to facilitate another felony, regardless of whether that felony actually occurred." *United States v. Payne*, 462 F. App'x 579, 581-82 (6th Cir. 2012) (citing *United States v. Richardson,* 510 F.3d 622, 629-30 (6th Cir. 2007) (McKeague, J., concurring)).

In his supplemental position paper challenging the PSR's application of § 2K2.1(b)(6)(B), Alden argued that "the firearms have not been shown to have facilitated or have had the potential of facilitating a felony drug offense." (1:14-cr-10053-JDB-egb, D.E. 31 at PageID 54.) "Their presence," he insisted, "was simply coincidental to the small quantity of hydrocodone found in the home, which was for personal use, not resale." (*Id.*, D.E. 31 at PageID 54.) Moreover, he argued, "there has been an insufficient nexus established between earlier cocaine sales and [the] money" found in the home:

> The PSR assumes that the $16,000.00 found in the home was from prior drug sales, but the only sales in evidence from the discovery production show the sale of one gram of cocaine on two separate occasions four months earlier. The PSR's assumption is based on the fact that one of the bills found was a marked bill that the authorities had given the confidential source to make one of the earlier purchases. (PSR, at ¶ 8.) One marked bill from a transaction that occurred four months prior cannot establish a nexus between the firearms found in the home and the $16,000.00, particularly because no cocaine, the drug Mr. Robertson is accused of selling, was found in the home.

(*Id.*, D.E. 31 at PageID 53, 54.)

At sentencing, the Government called as a witness detective Mike Woodyard of the Bolivar Police Department. Woodyard testified that he was involved in the investigation of the Defendant's drug dealing, which yielded "seven undercover purchases of cocaine from Mr. Robertson," three of which showed Robertson on video involved in "direct hand-to-hand transactions." (*Id.*, D.E. 38 at PageID 79, 86.) Upon a subsequent probation search of the Defendant's home, he and other officers discovered "a small amount of marijuana, a prescription bottle of Hydocodone tablets that had the label partially torn off, two firearms, and just over $16,000 in cash, 16,200—something." (*Id.*, D.E. 38 at PageID 81.) Of that amount, $7000 was found in an unspecified location, and $9000 was found hidden inside a lamp with a firearm. According to the detective, his department "subsequently seized" from Robertson "a Chevrolet Avalanche pickup and a Cadillac Escalade." (*Id.*, D.E. 38 at PageID 83.)

Woodyard further recalled that he asked Robertson at the time of the search whether he was employed, "and he indicated that he worked construction for his father." (*Id.*, D.E. 38 at PageID 82.) With regard to the bottle of hydrocodone, the pharmacy confirmed that the prescription was not for Robertson, but rather, for his neighbor, and that the bottle should have contained 39 pills had they been taken as prescribed.

As for the $7000, Robertson told the detective that the cash was "from sale of two vehicles recently," but he could not "produce a bill of sale or any type of document to support that." (*Id.*, D.E. 38 at PageID 82-83.) The Defendant's wife told Woodyard that "[s]he was a student at the time at a . . . cosmetology [school]," and that she "operated an unlicensed beauty shop on the property." (*Id.*, D.E. 38 at PageID 83.) The officer stated that he did not believe that she told him how much money she had earned.

A search warrant was later obtained for the Defendant's phone, which revealed "359 pages of text messages," dated from several months back and up until "the time [of] . . . the arrest." *(Id.*, D.E. 38 at PageID 85.) "The vast majority of those text messages involved narcotics transactions." (*Id.*, D.E. 38 at PageID 85.)

On cross-examination, defense counsel pressed Woodyard about the hydrocodone pills. The detective admitted that, in his experience, an addict "might take as many as 15 [pills] a day" for personal use, that it was "possible" that the Defendant "wasn't selling those at all, he was just taking them," and that, during his investigation, he "never purchased hydrocodone from" the Defendant. (*Id.*, D.E. 38 at PageID 88-89.) Counsel also submitted into evidence his client's drug report, which showed that, on the day of the arrest, he had opiates in his system. (*Id.*, D.E. 38 at PageID 91, *id.*, D.E. 33.)

Woodyard also confirmed that, "in all of the[] drug transactions" undertaken during his investigation, Roberston "never show[ed] anyone a firearm," and that he had "no knowledge of him possessing any firearm in connection with any of these drug transactions." (*Id.*, D.E. 38 at PageID 89.)

During oral argument, defense counsel challenged, among other things, the Government's reliance on the hydrocodone pills and the marked bill from a four-month-old drug transaction. (*Id.*, D.E. 38 at PageID 94-97.) Upon consideration of the evidence and the parties' arguments, the Court agreed with defense counsel that the Government had not proven that Defendant had been selling the hydrocodone pills. (*Id.*, D.E. 38 at 99.) It held, however, that the Government had established that the firearms either facilitated a prior drug transaction, as evidenced in part by the marked bill, or had the potential to facilitate drug transactions, as shown by the Defendant's criminal history as a drug trafficker; the fact that he "was involved in drug

transactions up almost to the point when he was arrested"; his failure to explain the source of the large sum of cash found in his home; and the proximity of the cash to the firearms. (*Id.*, D.E. 38 at PageID 100.) The Court, therefore, applied the § 2K2.1(b)(6)(B) enhancement. Defense counsel then argued that the purported "tenuous connection" of the firearms to drug transactions warranted a below-Guidelines sentence. (*Id.*, D.E. 38 at PageID 104.)

### B. Sources of the Money

The inmate has failed to establish that counsel performed deficiently by not putting on proof of legitimate sources for the money. Although he alleges in his affidavit that he told Alden about such sources, his testimony at the evidentiary hearing undermines the allegation.

Petitioner testified that he and his attorney "didn't go over nothing about no proceeds, all I know about is pills." (D.E. 48 at PageID 274.) When shown the letter he sent Alden after sentencing, he confirmed that he had never told counsel prior to sentencing that the funds were from a legitimate source:

> Q.      . . . [In the letter,] [y]ou mentioned about the money was yours, and the money was your wife's, you didn't know that the money was in the lamp.
>
>        Is that the first time you told Mr. Alden that?
>
> A.      Yes, that's the first time we ever discussed anything about some money. He didn't ask me where the money came from or nothing.

(*Id.* at PageID 275.)

As Robertson described it, there was a total lack of communication between himself and his attorney about where the money came from. That account directly contradicts the averment in his affidavit that he had "expressed multiple times to Mr. Alden that [he] had a legitimate source for the funds." (D.E. 16-2 at PageID n118.) The Court therefore finds that Robertson has failed to establish that he told his attorney that the money was from legitimate sources. Alden

has averred, and Petitioner has not credibly disputed, that they discussed the issue in their meetings with the investigator, but Robertson offered no explanation for, of proof of, legitimate sources. (D.E. 45-1 at PageID 213.) Accordingly, the argument that counsel performed deficiently is rejected.

Even if his attorney had performed deficiently, however, Petitioner has not established that he was prejudiced—that is, he has not shown a reasonable probability that counsel could successfully have argued that there was a legitimate source for the large amount of cash. Although over $16,000 was discovered, the insurance documents submitted by Petitioner show a total pay-out of $11,880. Of that total amount, checks for $569 and $873 were made payable to a rental car company, and $2887 was made payable jointly to Robertson's wife and "Weekly Pay Auto Sales, Inc." (D.E. 16-3 at PageID 112-13, 115.) At best, therefore, only $7551 of the $16,000 found in Robertson's home could have been attributed to a legitimate source, leaving the remaining $9000 unaccounted for.

### C. The Marked Bill

Robertson has also not established that counsel performed deficiently with regard to the marked bill. As noted, Alden argued that "[o]ne marked bill from a transaction that occurred four months prior cannot establish a nexus between the firearms found in the home and the $16,000.00" (1:14-cr-10053-JDB-egb, D.E. 31 at PageID 54.) Although aware of the Government's evidence in his criminal case (D.E. 48 at PageID 228-29, 231), he fails to point to anything suggesting the Government did not find a marked bill in his home, such that counsel should have challenged the nexus on that basis as well.

Even if Alden performed deficiently, Petitioner has not met his burden under *Strickland* to prove that he was prejudiced. Because he has failed to point to anything suggesting that a

marked bill was not found in his home, it is mere speculation that, had counsel demanded proof of the marked bill, the Court would not have applied the enhancement. In addition, not only did the Court find that the firearms facilitated a previous drug transaction, as evidenced in part by the marked bill, it also determined, based on numerous other considerations, that the firearms had the potential to facilitate future drug transactions. (1:14-cr-10053-JDB-egb, D.E. 38 at PageID 99-103.)

### D. Identification of Criminal Statutes

Robertson's last argument is that counsel was ineffective by not objecting to the Government's failure to indicate, by statutory citation, the other "felony offense[s]" connected to his possession of the firearms. U.S.S.G. § 2K2.1(b)(6)(B). He insists that, under *Grayer*, 625 F. App'x at 315, [t]he government should have identified the criminal statute that [he] violated." (D.E. 16-1 at PageID 108.)

The defendant in *Grayer* was convicted of being a felon in possession of a firearm and was sentenced based on the district court's application of the enhancement under U.S.S.G. § 2K2.1(b)(1)(A). *Grayer*, 625 F. App'x at 313. That Guideline provision increases the offense level if the offense involved three to seven firearms. *Id.* at 315 (citing U.S.S.G. § 2K1.2(b)(1)(A)). The district court applied the enhancement by "attributing . . . four firearms to Grayer" based on his having "referred [an undercover] agent to an associate who sold the agent another four firearms." *Id.* at 313, 315. The defendant appealed the application of the enhancement on the ground that his referral of the agent to his associate was not a crime. The Sixth Circuit agreed, finding that "neither the Government nor the district court [had] identified a federal or state law criminalizing" Grayer's conduct, and "[n]one is self-evident." *Id.* at 315. The court admonished the Government that, "[w]hen Grayer contested whether his conduct was

criminal, [it] should have identified the criminal statute that Grayer's conduct violated." *Id.* (citing *United States v. Catchings*, 708 F.3d 710, 721 (6th Cir. 2013); *United States v. Schaefer*, 291 F.3d 932, 938-41 (7th Cir. 2002); *United States v. Dickler*, 64 F.3d 818, 831 (3d Cir. 1995)).

*Grayer* does not support Petitioner's claim of attorney ineffectiveness. The "drug transactions" which the firearms facilitated, or had the potential to facilitate, referred to the sale and distribution of cocaine. (*See, e.g.*, 1:14-cr-10053-JDB-egb, D.E. 31 at PageID 54 ("[E]vidence from the discovery production show[s] the sale of one gram of cocaine on two separate occasions"); *id.*, D.E. 38 at PageID 78, 79, 85 (police completed "seven undercover purchases of cocaine from Mr. Robertson," text messages were found involving the "sell (sic) or distribution of controlled substances," and state charges for the "sell (sic) and delivery of cocaine" were pending).) The sale and distribution of cocaine is self-evidently a crime.

Robertson was therefore given fair notice of the offenses to which the Government sought to link the firearms. In addition, had defense counsel objected that the Government had not pointed out a criminal statute by citation, the Government could have, and most certainly would have, cited to Tennessee and federal laws prohibiting the sale and distribution of narcotics. *See, e.g.*, Tenn. Code Ann. §§ 39-17-417 (a), (c) ("It is an offense for a defendant to knowingly . . . sell a controlled substance," and the sale of "point five (0.5) grams or more of any substance containing cocaine" "is a class B felony"); 21 U.S.C. § 841(a)(1) ("[I]t shall be unlawful for any person knowingly or intentionally . . . to . . . distribute . . . a controlled substance").

Accordingly, counsel did not perform deficiently and Petitioner was not prejudiced. Claim 2 is DENIED.

For all these reasons, the Amended Petition is DENIED.

## APPEAL ISSUES

A § 2255 petitioner may not proceed on appeal unless a district or circuit judge issues a certificate of appealability ("COA"). 28 U.S.C. § 2253(c)(1); Fed. R. App. P. 22(b)(1). A COA may issue only if the petitioner has made a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2)-(3). A substantial showing is made when the petitioner demonstrates that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Miller-El v. Cockrell,* 537 U.S. 322, 336 (2003) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)). "If the petition was denied on procedural grounds, the petitioner must show, 'at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.'" *Dufresne v. Palmer*, 876 F.3d 248, 252-53 (6th Cir. 2017) (quoting *Slack*, 529 U.S. at 484).

In this case, reasonable jurists would not debate the correctness of the Court's decision to deny the Amended Petition. Because any appeal by Petitioner does not deserve attention, the Court DENIES a certificate of appealability.

Pursuant to Federal Rule of Appellate Procedure 24(a), a party seeking pauper status on appeal must first file a motion in the district court, along with a supporting affidavit. Fed. R. App. P. 24(a). However, Rule 24(a) also provides that if the district court certifies that an appeal would not be taken in good faith, the prisoner must file his motion to proceed *in forma pauperis* in the appellate court. *Id.*

In this case, for the same reason it denies a COA, the Court CERTIFIES, pursuant to Rule 24(a), that any appeal in this matter would not be taken in good faith. Leave to appeal *in forma pauperis* is therefore DENIED.[6]

IT IS SO ORDERED this 13th day of September 2018.

s/ J. DANIEL BREEN
UNITED STATES DISTRICT JUDGE

---

[6] If Petitioner files a notice of appeal, he must also pay the full $505.00 appellate filing fee or file a motion to proceed *in forma pauperis* and supporting affidavit in the Sixth Circuit Court of Appeals within thirty days.